**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **NATIONAL WILDLIFE FEDERATION, et al.,**<br><br>　　**Plaintiffs,**<br><br>　　　　v.<br><br>**U.S. ARMY CORPS OF ENGINEERS, et al.,**<br><br>　　**Defendants.** | **Civil Action No. 14-1701 (JDB)** |

**MEMORANDUM OPINION**

This case involves a challenge by several conservation groups to the Army Corps of Engineers' decision to reissue a nationwide permit authorizing the discharge of dredged and fill material to construct bank stabilization projects. The conservation groups allege that the U.S. Army Corps of Engineers (the "Corps") issued the permit in violation of the Administrative Procedure Act ("APA"), the National Environmental Policy Act ("NEPA"), the Clean Water Act ("CWA"), and the Endangered Species Act ("ESA").[1] Because these plaintiffs lack standing to bring this action, it will be dismissed without prejudice for lack of jurisdiction.

**BACKGROUND**

This lawsuit was brought by three conservation groups, National Wildlife Federation, Ogeechee Riverkeeper, and Savannah Riverkeeper, whose membership includes outdoor enthusiasts who spend significant time recreating in the river basins of the Georgia coast. Second

---

[1] The conservation groups also brought claims under the Rivers and Harbors Appropriation Act, Second Am Compl. [ECF No. 15] ¶¶ 146, 173, but did not pursue those claims in their summary judgment briefing. Those claims have therefore been abandoned. See Noble Energy, Inc. v. Salazar, 691 F. Supp. 2d 14, 23 n.6 (D.D.C. 2010).

1

Am. Compl. [ECF No. 15] ¶ 15. Jesse Demonbreun-Chapman, for example, a member of Ogeechee Riverkeeper, regularly kayaks in the Ogeechee River basin. Demonbreun-Chapman Decl. [ECF No. 22-1] ¶ 9. And Wanda Scott, a member of Savannah Riverkeeper, frequently kayaks and sails in the Savannah River basin. Scott Decl. [ECF No. 22-1] ¶ 5. They enjoy the natural beauty of the Georgia coast—a beauty they say has been marred by the construction of bulkheads (a type of erosion-prevention structure) that replace portions of the natural shoreline with man-made infrastructure. See Demonbreun-Chapman Decl. ¶ 10; Scott Decl. ¶ 7.

Although the Clean Water Act generally prohibits the construction of such structures, insofar as they involve the discharge of dredged and fill material into U.S. waters, such activity can proceed if the Corps issues a permit. 33 U.S.C. § 1311(a). There are two types of CWA permits: individual permits that are tailored to specific projects, id. § 1344(a), and general permits that authorize categories of actions, id. § 1344(e). The bulkheads disturbing plaintiffs' peace along the Georgia coast were authorized pursuant to a general permit. General permits may be promulgated by the Corps for a category of action when that activity will cause only minimal adverse environmental effects on both an individual and cumulative level. See § 1344(e)(1). The permits "may extend to activities throughout a state, a region, or the nation; must be reevaluated at least every five years if they are to be reissued; and may contain general conditions applicable to all projects subject to approval thereunder." Sierra Club v. U.S. Army Corps of Eng'rs, 803 F.3d 31, 39 (D.C. Cir. 2015). Before issuing a nationwide permit, the Corps "conducts the impact analysis specified in Subparts C through F of the Environmental Protection Agency's Clean Water Act Section 404(b)(1) guidelines." Ouchita Riverkeeper, Inc. v. Bostick, 938 F. Supp. 2d 32, 35 (D.D.C. 2013) (citing 40 C.F.R. Part 230). Once a general permit has been issued, individual

activities falling within its ambit and meeting its general conditions may usually proceed without further ado. See 33 C.F.R. §§ 330.1(e)(1); 330.2(c).

The general permit at issue in this lawsuit, nationwide permit 13 ("NWP 13"), authorizes bank stabilization activities like those in the Ogeechee River and Savannah River basins. It was issued on February 21, 2012, along with 50 other nationwide general permits. See Reissuance of Nationwide Permits, 77 Fed. Reg. 10,184, 10,272 (Feb. 21, 2012). In issuing NWP 13, the Corps estimated that between 2012 and 2017 approximately 17,500 projects would be authorized under its auspices. J.A. Volume I [ECF No. 31] at 290. One example important to this case is a 177-foot NWP 13 bulkhead that was constructed on the relatively undeveloped 8.1-mile Bull River in the Savannah River basin. See Second Am. Compl. ¶ 130; Pls.' Reply in Supp. of Mot. Summ. J. [ECF No. 29] at 6 n.2; Scott Decl. ¶ 8. Plaintiffs point to this bulkhead as evidence of the harm caused by NWP 13. Among the harms alleged: bulkheads cause erosion, impair water quality, and destroy wildlife habitat, including the habitat of endangered and threatened species. Second Am. Compl. ¶ 17. At the heart of this lawsuit is the conservation groups' contention that the Corps failed adequately to evaluate these environmental impacts before issuing NWP 13.

Due to the alleged insufficiency of the Corps' analysis of the environmental impacts, the conservation groups claim that the issuance of NWP 13 violates the CWA and NEPA. The Corps' environmental impact analysis required by the CWA and its assessment of the environmental considerations required by NEPA is presented in the agency's NWP 13 Decision Document. See J.A. Volume 1 at 119–63. The Corps concluded that "[t]he individual and cumulative adverse effects on the aquatic environment resulting from the activities authorized by this NWP will be minimal." Id. at 156. The conservation groups attack this conclusion from many angles; for example, they argue that the Corps failed to complete the 404(b)(1) Guidelines impact analysis

3

required by the CWA before determining that the permit would have minimal cumulative adverse effects. See Pls.' Mot. Summ. J. [ECF No. 22] at 24–30. The Corps' NEPA analysis found that the "issuance of this NWP will not have a significant impact on the quality of the human environment." J.A. Volume 1 at 162. The conservation groups argue that the Corps inadequately justified this finding of no significant impact and therefore violated NEPA by failing to prepare an environmental impact statement ("EIS").[2] Pls.' Mot. Summ. J. at 33–39.

The conservation groups also argue that the Corps violated the Endangered Species Act, which "is designed to ensure that endangered species are protected from government action." Ctr. for Biological Diversity v. U.S. Dep't of Interior, 563 F.3d 466, 474 (D.C. Cir. 2009). Under Section 7(a)(2) of that Act, "each federal agency is required to ensure that any action undertaken by the agency 'is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification' of critical animal habitats." Id. (quoting 16 U.S.C. § 1536(a)(6)). "If an agency concludes that its action 'may affect' a listed species or critical habitat, then the agency must pursue either formal or informal consultation with the [National Marine Fisheries Service] or [the] Fish and Wildlife [Service]." Id. at 474–75. The NWP 13 Decision Document found that the "activities authorized by this NWP will not jeopardize the continued existence or [sic] any listed threatened and endangered species or result in the destruction nor adverse modification of critical habitat." J.A. Volume 1 at 292. The conservation groups challenge this conclusion as arbitrary and capricious and argue, therefore, that the Corps violated the ESA by not consulting with the FWS. Pls.' Mot. Summ. J. at 39–42; Pls.' Reply at 24–26.

---

[2] Under NEPA an EIS must be prepared by a federal agency for all "proposals for . . . major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C)(i).

4

The conservation groups brought this lawsuit against the Corps as a facial challenge to NWP 13 and an as-applied challenge to the Bull River bulkhead approval. They ask the Court to vacate NWP 13 as well as the Bull River bulkhead authorization and to enjoin the Corps from authorizing future projects under the general permit. Second Am. Compl. at 39. In addition to responding on the merits, the Corps argues in its cross-motion for summary judgment that the conservation groups lack standing to sue despite their submission of declarations executed by six of their members that seek to demonstrate that the declarants are injured by the Corps' reissuance of NWP 13.[3] See Defs.' Cross-Mot. Summ. J. [ECF No. 25] at 13–16. The Court will therefore begin, as it must, with whether the conservation groups have standing to bring this lawsuit.

## DISCUSSION

"An association has standing to sue under Article III of the Constitution of the United States only if (1) at least one of its members would have standing to sue in his own right; (2) the interest it seeks to protect is germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the member to participate in the lawsuit." Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin., 724 F.3d 243, 247 (D.C. Cir. 2013) (internal quotation marks omitted). The Court has no reason to doubt that the conservation groups satisfy the second and third requirements for associational standing. The issue, then, is whether at least one of the plaintiffs' members has standing under Article III. "The irreducible constitutional minimum of Article III standing requires satisfaction of three elements: (1) a concrete and particularized and actual or imminent injury-in-fact that is (2) fairly traceable to the challenged action of the

---

[3] The Corps accurately points out that the conservation groups did not submit any declarations on behalf of the National Wildlife Federation to establish that organization's standing. Defs.' Cross-Mot. Summ. J. [ECF No. 25] at 14 n.8. Having failed to "specifically identify" a member who has suffered the requisite harm, NWF does not have associational standing to bring this lawsuit. See Friends of Animals v. Jewell, 115 F. Supp. 3d 107, 119 (D.D.C. 2015). Hence, the Court's inquiry is limited to whether Savannah Riverkeeper or Ogeechee Riverkeeper have standing.

defendant . . . and (3) likely to be redressed by a favorable decision." In re: Idaho Conservation League, 811 F.3d 502, 508 (D.C. Cir. 2016) (internal quotation marks omitted) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992)).

These requirements are modified somewhat in cases where plaintiffs claim they have sustained a procedural injury, meaning an injury resulting from the violation of a procedural right created by statute. See Ctr. for Law & Educ. v. Dep't of Educ., 396 F.3d 1152, 1157 (D.C. Cir. 2005). In order to establish standing regarding a procedural injury, plaintiffs must show "some concrete interest" that is "adversely affected by the procedural deprivation." WildEarth Guardians v. Jewell, 738 F.3d 298, 305 (D.C. Cir. 2013); see Ctr. for Law & Educ., 396 F.3d at 1159 ("Appellants must show both (1) that their procedural right has been violated, and (2) that the violation of that right has resulted in an invasion of their concrete and particularized interest."). "The person who has been accorded a procedural right to protect [her] concrete interests," though, "can assert the right without meeting all the normal standards for redressability and immediacy." Lujan, 504 U.S. at 572 n.7.

The conservation groups assert both "a substantive injury caused by the application of NWP 13 to the Bull River bulkhead and other bank stabilization projects in the Savannah and Ogeechee Rivers; and . . . a procedural injury caused by the Corps' failure to adequately evaluate the environmental impact of NWP 13 projects." Pls.' Reply at 2. The Court will begin its analysis by determining whether the Corps has established a substantive injury-in-fact for each of its claims. See Davis v. Fed. Election Comm'n, 554 U.S. 724, 734 (2008) ("[A] plaintiff must demonstrate standing for each claim . . . and for each form of relief . . . ." (internal quotation marks omitted)).

The first claim to fall is plaintiffs' claim of recreational injury arising from environmental harm caused by agency action in violation of the ESA. It is well-established that the desire to

"observe an animal species, even for purely esthetic purposes, is . . . a cognizable interest for purpose[s] of standing." See Lujan, 504 U.S. at 562–63. But the injury-in-fact test also requires that one of the plaintiffs' members having such an interest be directly affected by the agency action. Id. at 563. Logically, in order for a plaintiff's desire to view an animal species to be directly affected by the agency action, such viewing must take place at the area affected by the challenged activity. See id. at 565–66 ("[A] plaintiff claiming injury from environmental damage must use the area affected by the challenged activity . . . ."); see also Fed. Forest Res. Coal. v. Vilsack, 100 F. Supp. 3d 21, 43 (D.D.C. 2015) ("[P]laintiffs can demonstrate standing only if application of the regulations by the Government will affect them in the manner described in the complaint." (internal quotation marks and brackets omitted)). None of the plaintiffs' declarations establish this essential fact. Take, for example, Emily Markesteyn, who enjoys seeing endangered loggerhead sea turtles, piping plovers, and wood storks on Wassaw Island and in the Wilmington River. Markesteyn Decl. [ECF No. 22-1] ¶ 11. Markesteyn has established an interest in viewing these endangered species, but that interest is not linked to her use of an area affected by existing NWP 13 structures or threatened by impending NWP 13 projects. Therefore, as to the ESA claim, she cannot show that she is "directly affected" by the agency action. Plaintiffs' other standing affidavits are similarly flawed, and therefore do not state a substantive injury-in-fact to support standing for the ESA claim. See Kristina Carroll Decl. [ECF No. 22-1] ¶ 9; Jennifer Hilburn Decl. [ECF No. 22-1] ¶ 10.

As to the NEPA and CWA claims, however, the conservation groups have put forth at least one member who states a substantive injury-in-fact. Wanda Scott states that she "spend[s] a great deal of time kayaking, sailing, and swimming in the Savannah River basin." Scott Decl. ¶ 5. When she visits areas where bulkheads exist, the structures lessen her enjoyment of these activities

because of their "unsightly appearance." Id. ¶ 7. Hence, she tends to avoid those areas. Id. This harm to Scott's aesthetic and recreational interests establishes a concrete and particularized injury. See Summers v. Earth Island Inst., 555 U.S. 488, 494 (2009); see also Sierra Club v. Jewell, 764 F.3d 1, 5–6 (D.C. Cir. 2014) (accepting the appreciation and study of aesthetic features as a concrete interest); id. at 5 ("[I]njury in fact can be found when a defendant adversely affects a plaintiff's enjoyment of flora or fauna." (internal quotation marks omitted)).

The Corps argues that this claim—unconnected to any particular bulkhead—is insufficient because Summers v. Earth Island Institute requires that standing declarations identify a specific site that is or could imminently be subject to agency action. See Defs.' Cross-Mot. at 14–15. But in fact, in Summers the Supreme Court confirmed the rule that environmental plaintiffs establish an injury by showing that they use the area affected by the challenged activity. 555 U.S. at 499 ("[T]o establish standing plaintiffs must show that they use the area affected by the challenged activity and not an area roughly in the vicinity of a project site . . . ." (internal quotation marks omitted)); see WildEarth Guardians, 738 F.3d at 305 (confirming that environmental plaintiffs must "aver that they use the affected area"). The failure to identify a "particular site" was only a problem in Summers because without such a claim the Court could not "assure itself" of an imminent future injury, i.e., that the respondents would "make use of the specific sites upon which projects may take place." 555 U.S. at 495, 499. Here, though, the injury alleged is not a future injury; it is an actual injury caused by already constructed projects. Scott claims that she visits areas where NWP 13 bulkheads currently exist and experiences decreased enjoyment because of their "unsightly experience." She has therefore shown that she uses parts of the river basin that are affected by the localized harm of NWP 13 projects. See Friends of The Earth, Bluewater Network Div. v. U.S. Dep't of Interior, 478 F. Supp. 2d 11, 19 (D.D.C. 2007) (allowing the

inference that affiants use parts of the affected parks from plaintiffs' statement saying they experience the off-road vehicle damage).

The Corps also argues that standing is lacking because plaintiffs' declarations "do not detail current plans to return to the specific sites in question." Defs.' Reply [ECF No. 30] at 2. It is true that to determine whether an injury is imminent a court must sometimes inquire whether there are current plans to return to the offending location. See Lujan, 504 U.S. at 564. But again, here Scott has stated an actual and ongoing injury: she avoids areas where bulkheads exist because NWP 13 structures diminish her enjoyment of those areas. Injury can take the form of adjusting behavior. See Humane Soc'y of the United States v. Jewell, 76 F. Supp. 3d 69, 106–07 (D.D.C. 2014), appeal docketed, No. 15-5061 (D.C. Cir. Feb. 27, 2015). Hence, the Court is unconcerned with whether Scott has stated detailed plans to visit the site of a future bulkhead.

Of course that begs the question whether plaintiffs have stated a concrete and particularized and imminent injury threatened by future bulkheads. And in answering this question, the Corps' reliance on Summers is appropriate. The standing affidavit at issue in Summers asserted that the affiant planned to visit "several unnamed National Forests in the future." 555 U.S. at 495 (emphasis added). The Court noted that where the "National Forests occupy more than 190 million acres, an area larger than Texas," there was "hardly a likelihood" that the affiant's "wanderings" would bring him into contact with a tract of land "about to be developed by the Forest Service in a way that harms his recreational interests." Id. at 495–96. Here, similarly, the conservation groups make little to no effort to show that their members' river activities take place along a portion of the shoreline about to be altered by an erosion prevention structure. They do not even identify a pending NWP 13 project in the area—or anywhere. At the motions hearing held on January 19, 2016, the Court pressed the conservation groups to identify what "future projects . . . will impact

9

the aesthetic or recreational interest of . . . declarants?" Plaintiffs' counsel failed to name any such project. Hr'g Tr. at 64 ("I think the future injuries are the fact that Nationwide Permit 13 could continue to apply to bulkheads in the area where these witnesses use and paddle."). Hence, plaintiffs have not stated an imminent concrete injury threatened by future NWP 13 projects.

It is true that the conservation groups' summary judgment briefing left open the possibility that the Bull River bulkhead was an imminent, but not yet existing, NWP 13 project. And under this theory, perhaps Scott's declaration could show a concrete, particularized, and imminent injury insofar as she asserts that she currently uses the Bull River for recreation and would not visit areas where NWP 13 structures are built because of their unsightly appearance. Scott Decl. ¶¶ 7–8. But at the motions hearing the conservation groups did not contest that the Bull River project was completed before their complaint was filed. See Hr'g Tr. at 3, 30. Therefore, it cannot be the basis for a threatened future injury. See Nat. Law Party of U.S. v. Fed. Elec. Comm'n, 111 F. Supp. 2d 33, 41 (D.D.C. 2000) ("Standing is based upon the facts as they exist at the time the complaint is filed . . . .").

Thus concludes the substantive injury-in-fact inquiry. Still viable at this juncture is the conservation groups' claim of an actual ongoing harm to their recreational and aesthetic interests, which supports standing to bring their NEPA and CWA claims. It is at this first step of the standing analysis that the Corps most strenuously asserted that the conservation groups had stumbled. But having cleared this hurdle, plaintiffs ultimately lose their footing by failing "to establish that a favorable decision on the merits of [their] claim[s] will likely ameliorate the harm alleged." Douglas Timber Operators, Inc. v. Salazar, 774 F. Supp. 2d 245, 252 (D.D.C. 2011); see Sierra Club, 764 F.3d at 5 ("To establish standing . . . [plaintiffs] must show . . . it is likely . . . that the injury will be redressed by a favorable decision.").

Redressability focuses on the requested relief. Douglas Timber Operators, 774 F. Supp. 2d at 252. Here, the conservation groups ask the court to vacate NWP 13 and enjoin all future authorizations under the general permit. And they confirmed at the motions hearing that they do not seek relief in the form of removing existing bulkheads. Hr'g Tr. at 30. But as established above, their only concrete and particularized injury is an actual, not imminent, harm tied to an existing bulkhead. Because the conservation groups cannot show that their only injury—caused by bulkheads that existed when their complaint was filed—will be redressed by the injunctive and declaratory relief sought, their substantive injury will not support standing to pursue their NEPA and CWA claims. See Friends of Tims Ford v. Tenn. Valley Auth., 585 F.3d 955, 970–71 (6th Cir. 2009) (holding that plaintiff lacked standing because the requested declaratory or injunctive relief could not redress the "only allege[d] direct harm from already-constructed community boat docks"); Fox v. Palmas Del Mar Props., Inc., 620 F. Supp. 2d 250, 262–63 (D.P.R. 2009) (holding that plaintiffs lacked standing because the requested injunctive and declaratory relief would not redress the harm caused by completed construction).

That leaves the conservation groups with one remaining route to establish standing: their allegation of a procedural injury. As explained above, as to their NEPA and CWA claims, the conservation groups have put forward at least one member with a concrete interest in the construction of NWP 13 structures in the Savannah River basin, and the Court finds that interest is tied to the alleged procedural injuries. See WildEarth Guardians, 738 F.3d at 305 ("A procedural injury claim . . . must be tethered to some concrete interest adversely affected by the procedural deprivation . . . ."). It is, after all, because of the Corps' alleged procedural failings that NWP 13 was issued and the offending projects authorized. But the conservation groups are once again stymied by Article III's redressability requirement.

Although it is true that the redressability requirement is "relaxed" for plaintiffs asserting procedural injuries, WildEarth Guardians, 738 F.3d at 306, "relaxed" does not mean erased. Rather, the "relaxation" of the redressability requirement recognizes the difficulty plaintiffs face in showing that the righting of a procedural wrong will necessarily lead to a different substantive outcome. For example, "one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years." Lujan, 504 U.S. at 572 n.7. While the plaintiff in that hypothetical case cannot establish with any certainty that preparation of the EIS will remedy his concrete interest by preventing the construction of the dam, such a result is at least possible. Here, however, similar relief is not.

Even if NWP 13 were vacated and/or the Court were to remand to the Corps to conduct a further environmental analysis, the harm to plaintiffs' concrete interest in the natural beauty of the Georgia coast—tied as it is only to existing bulkheads—could not be redressed. And it is this concrete injury that remains at the heart of the redressability inquiry, even when dealing with a procedural injury. See Fla. Audubon Soc'y v. Bentsen, 94 F.3d 658, 669 (D.C. Cir. 1996) (en banc) (The "particularized injury" is the "focus of standing analysis even in procedural-rights cases." (internal quotation marks omitted)). Decisions in this Circuit and others confirm that a court must look at the underlying concrete interest when assessing redressability of a procedural injury. See In re: Idaho Conservation League, 811 F.3d at 511–12 (assessing redressability of procedural injuries by looking at whether promulgating a different rule would limit plaintiffs' exposure to hazardous waste); Ass'n of Am. Physicians & Surgeons v. Sebelius, 746 F.3d 468, 472 (D.C. Cir. 2014) (assessing redressability of a procedural injury by looking at "whether

compliance with the procedural requirement would lead to 'redress' of the party's <u>substantive injury</u> (i.e., lead to a less injurious outcome)" (emphasis added)); <u>Black v. LaHood</u>, 882 F. Supp. 2d 98, 106–07 (D.D.C. 2012) (holding that plaintiffs could not show redressability because the alleged "concrete injuries" caused by the road closure would remain even if the court declared the approval of the project unlawful); cf. <u>Sierra Club v. U.S. Army Corps of Eng'rs</u>, 277 F. App'x 170, 173 (3d Cir. 2008) (finding that redressing procedural harms under the CWA, NEPA, and the APA would not redress alleged injuries to plaintiffs' recreational and aesthetic interests because the wetlands they enjoyed were gone and plaintiffs did not ask that the existing structures be removed). For example, in <u>Rattlesnake Coalition v. EPA,</u> the Ninth Circuit held that an environmental coalition lacked standing to bring a NEPA lawsuit asserting the EPA should have prepared an EIS on a wastewater treatment plant because construction of the plant was already completed when the complaint was filed. 509 F.3d 1095, 1102–03 (9th Cir. 2007). The court concluded that any injury suffered—in that case, alleged health problems and a decrease in the enjoyment and value of property—due to the EPA's failure to follow NEPA procedures could not be remedied by requiring the EPA to now produce an EA and EIS. <u>Id.</u> at 1103.

      The fate of the conservation groups in this case is the same. An order directing the Corps to remedy procedural failings in its issuance of NWP 13 could in no way help Scott, who suffers an ongoing aesthetic harm caused by <u>existing</u> NWP 13 bulkheads. They would not be altered. Plaintiffs asserting procedural injuries must show that a procedural right, "if exercised, <u>could</u> protect their concrete interests." <u>Salmon Spawning & Recovery All. v. Gutierrez</u>, 545 F.3d 1220, 1226 (9th Cir. 2008). Because they cannot do so, the conservation groups lack standing to pursue their procedural-injury claims. See <u>Ass'n of Am. Physicians & Surgeons</u>, 746 F.3d at 472 (holding plaintiffs lacked standing where "all the procedure in the world could not . . . lead the [agency] to

a conclusion that would redress appellants' substantive injury"). The concrete and particularized injuries asserted by the conservation groups and their members rest on aesthetic harms from completed NWP 13 projects that will remain unchanged by any correction of procedural errors.

## CONCLUSION

It is not hard to imagine a nearly identical case where the plaintiffs have standing based on an identified and imminent general permit activity that, if constructed, threatens to cause a concrete and particularized injury. Such an injury could be redressed by an injunction against future projects or avoided by vacating the permit and forcing the agency to comply with procedural requirements. But that is not this case. Here, the only concrete and particularized interest stated in the conservation groups' standing declarations is a harm caused by existing NWP 13 structures. Plaintiffs do not seek the removal of these projects. The disconnect between the relief sought and the harm stated therefore precludes finding the requisite redressability. Absent redressability, the conservation groups cannot establish standing. And without standing, the lawsuit cannot proceed.

The Court will therefore grant the Corps' cross-motion for summary judgment insofar as it seeks the dismissal of this action for lack of standing. A separate Order will issue on this date.

/s/
JOHN D. BATES
United States District Judge

Dated: March 14, 2016